## No. 8979.

## MARK F. BIGNEY VS. W. VAN BENTHUYSEN AND "THE STATES."

One who habitually libels others complains with bad grace of being himself libelled, and therefore where two parties engage in a newspaper controversy, and hurl abusive epithets at each other, they are both in the wrong, and neither can recover damages from the other.

Editors of newspapers, and writers for them, have no peculiar rights or privileges in this respect, and have no more claims to indulgence than others. They are held to the same responsibility with any other person, and malice on their part is conclusively inferred if the publication is false.

The law gives no countenance to the proposition that immunity can be claimed by an editor or publisher of a newspaper, if he shall pamper a depraved public appetite by the publication of falsehoods and calumnies upon private character, nor does it give encouragement to the circulation of defamatory publications by protecting the retailers of them. It protects the character of a man as studiously as it protects his property.

One, who is himself in fault, cannot recover damages from another who has retaliated in kind, although the latter was not justifiable in law, and this holds good in spite of the truism that one wrong does not justify another.

APPEAL from the Civil District Court for the Parish of Orleans. *Rightor*, J.

*J. Livingston* and *Braugh, Buck & Dinkelspiel*, for Plaintiff and Appellee.

1. The defendant, being president of several city railroads, is considered, in law, a public man, and not a private citizen. Odgers on Libel, 40.

Bigney vs. Van Benthuysen.

2. That in all matters of public interest, the press, to a certain extent, is privileged to comment freely upon the acts of public persons, and it is its duty to do so. Odgers, 40; Local Affairs, 46; Townshend on Libel, 441, 442; Folkhards Starkie, Secs. 678, 680, 687.

3. That a libel is an offense which may be punished by fine and imprisonment; that slander is not classed among criminal offenses. Revised Statutes.

4 That the falsehood of all defamatory words is presumed in plaintiff's favor; that he need give no evidence that they are false. Odgers, 107.

5. That defendant's conduct of his case, even the language used by his counsel at the time, may aggravate the damages. So, if the plea of justification is not proved, it will enhance damages. Odgers, 177, 485, 486, 487.

6. Words spoken of the plaintiff, in the way of his trade or profession, are actionable without proof of special damage. Odgers, 2, introduction.

7. That words must be understood and construed according to the ordinary meaning attached to them. Odgers, 94, 97.

8. That under the plea of justification the whole of the libel must be proved true. Odgers, 199.

9. That the plea of justification is evidence of malice, and may be relied upon as such by the plaintiff in aggravation of damages. Odgers. 178.

10. If the libel is sold indiscriminately to the public, the jury must consider that fact in assessing damages, for the defendant has put it out of his power to recall and contradict his statement, even should he desire to do so. Odgers, 298.

11. That it is not necessary to prove special damages wherever the words are spoken of him in the way of his profession Odgers, 309.

12 Justification is a most dangerous plea and should never be placed upon record, without careful consideration of the sufficiency of the evidence to prove it. Odgers, 488.

13. That every man has a right to his good name maintained unimpaired* This right is a *jus in rem*, a right absolute and good against all the world. Odgers, 1, 2.

14. Every man has a right to be protected from defamation, as much as from assault and bodily harm. His reputation is his property, and, if possible, more valuable. Odgers, 158.

15. That the innuendoes in plaintiff's petition are true and correct, and as definitions of words used in the libel, as taken from the English dictionaries. Odgers, 94, 97.

16. That the definition of the word "scoundrel," in defendant's plea of justification, is a libel against plaintiff and against every honest, just and honorable man, and aggravates damages.

17. One libel does not justify another. Thus, if one person publishes matter libellous in its nature against another, the person libelled cannot retort with a libel. Courts are tribunals to settle disputes between persons. Odgers, 307; Townshend, 564.

18. On questions of damages, jurors are the judges. Injury to the feelings is something that cannot be measured by evidence. Where the libel is admitted or proved, the plaintiff need not prove any specific damage, but the jury must assess the same in accordance with the *gravamen* of the libel, and proportioned to the means of the person condemned. Sutherland on Damages, 3d vol, 643, 644, 659, 660.

*John M. Bonner* and *E. H. Farrar* for Defendant and Appellant.

There has been no proof of damages either general or special in this case.

Pecuniary loss to the plaintiff is the gist of the action in slander or libel. Townshend on Slander and Libel, 3d Ed. 108, 109, § 57.

Without proof of special damages, no action will lie for calling a man a rascal, a scamp or a scoundrel. Odgers on Slander and Libel, 1, 2, 3, 18, 109, 61, 82-84; 15 A. 48; 29 A. 137.

How, then, without such proof, can anything more than mere nominal damages be recovered for putting these mere terms of abuse in writing?

The plaintiff must recover upon the strength of the allegations of his own petition, and can derive no assistance from the averments of the defendant, whether they be proved or not.  36 Am. Rep. 79; 30 A. 240; 34 A. 306; 9 La. 457.

The office of the innuendo is to explain what is ambiguous or obscure, and there is no occasion for its use where the meaning sufficiently appears from the context.

Its function is to point the application, not enlarge the sense.   15 Wend. 235; Townshend on Slander and Libel, 3d Ed. 578 and note; 177 and note.

Evidence cannot be introduced to support or explain an innuendo.  *Id.* 590, § 342.

In pleading the truth of the alleged libellous matter in bar of the action, it is sufficient if the sting of the charge be justified, and it is not necessary to justify each word and epithet.   Ogders on Slander and Libel, 486; Townshend, do. 3d Ed. § 213, and 370, note.

Where the plaintiff himself has been in fault and where his previous and repeated unjustifiable attacks on the defendant have provoked the publication complained of, there can be no recovery.  2 Camp. 72; 13 Pick. 510; 28 A. 710; 30 A. 241; 34 A. 333, 940; Odgers on Slander and Libel, 228, 229.

---

The opinion of the Court was delivered by

MANNING, J.   This case presents the novel spectacle of an editor of a newspaper suing another newspaper for a defamatory publication. Its incongruousness was so palpable that the claim against the defendant newspaper seems to have been abandoned, and the trial was had with its co-defendant alone.

The plaintiff is the editor of the "City Item."   The action is for a libel, based upon the publication of a card in the "States" of January 23, 1882, and the damages are laid at $25,000.   The jury returned a verdict of $4,750.   The card is as follows:

### M. F. BIGNEY.

The above-named scoundrel, editor of the City Item, has been in the habit of publishing, in the columns of his paper, lying statements with reference to business matters, and coarse, impertinent allusions to individuals, intended as wit.   When called to account, he resorts to the indecent method of representing those alluded to as bulldozers and swaggerers.   Any one having respect for the opinions of others would adopt some other course of action.

This creature having no respect for anything, has no such conception of duty.   It, therefore, becomes necessary to brand him thus publicly, that his infamous character may be known to all.

The States is authorized to furnish the name of the writer.

*          *          *

The plaintiff alleges that he has lived in the city since 1848, during which time, writing for newspapers has been his occupation, and is his sole means of support—that he has been for four years editor of the City Item as well as president of the association that prints and publishes it, and his retention of these positions depends upon his business

capacity, good name and character, which are imperilled by the publication of the "false, scandalous, malicious, and defamatory libel," made by the defendant with the intent to "crush, destroy, and forever injure the good name of the plaintiff, and render him an object of scorn and contempt,"—that the defendant is a merchant of large means and great influence, as also the president of the Crescent City Railroad and other tramways connected therewith, and has a large number of employees under him, and that he relied upon these weapons, *i. e.* great wealth, great influence, great patronage, to ruin the plaintiff, and fashioned this libel as an instrument to accomplish his destruction.

Nothing in the card indicated who was the writer, or gave any clue for his discovery. On application to the States for the name of the writer, it was disclosed.

The answer admits authorship of the card, and avers that he was provoked into writing it by the plaintiff's "repeated wanton, wicked, malicious, and defamatory articles against him," which had been published through the City Item to this community, and which attacked his character and defamed his business—that he had remonstrated with the plaintiff for these publications in a polite note wherein he reminded him that he was a private citizen, and asked that the notoriety unwarrantably given him by the frequent mention of his name in a newspaper should be discontinued—that shortly thereafter, three articles were published in the Item reflecting injuriously on him, and the corporation of which he is president, whereupon he again wrote to the plaintiff requesting a correction of the misrepresentation in those articles, and instead of making it, the plaintiff published an abusive and insulting attack upon him wherein he is vilified as "an irate swaggerer, trying his hand at bulldozing this paper," and other like offensive language is used—and that the card, signed by three asterisks, was thereupon written by him and published as charged. The answer further avers that every man has the right to repel assaults upon his reputation and character made in a newspaper, and can employ the same channel of communication with the public to defend himself, and in so doing that he can lawfully make his "counter-publication sufficiently terse and vigorous to meet the purpose for which it is written," and that the card was published with that view alone, and was not malicious but defensive, and so far from causing the plaintiff any damage that he admitted he could not be injured thereby, and boasted in his newspaper of the following day that "his reputation was too well established in the community to need vindication from the assaults of an anonymous slander-

er." In addition, the defendant pleaded the truth of the alleged libellous matter, which it may be well to say at once was not sustained.

This is an epitome of the pleadings, so far as a petition of fifteen and an answer of twenty pages of manuscript can be condensed in the space we have given them.

The testimony took a wide range. Files of newspapers, the reading of which must have been a sore burden even when fresh, were injected into the evidence, and the journalistic career and personal conduct of the plaintiff were subjected to a searching investigation. One rises from the reading of the transcript with the consciousness that the plaintiff has been on trial, rather than appearing as complainant of an injury. A large part of the testimony was directed to the inquiry whether he did not habitually vituperate whomsoever it was his pleasure or interest to assail, and refuse or omit to correct errors and misrepresentations when the truth was laid before him. Editors, and writers on the staff, of several newspapers differed in their opinions on this matter, but it is curious to observe the unanimity with which they betrayed their conviction, that however abhorrent any publication about a public or private man may be, made too without knowledge of its truth or falsity, and even without inquiry touching the one or the other, that they make full reparation by publishing the correction of the error. It does not seem to have occurred to them that the publication should not be made in the first instance without inquiry or investigation.

Old associates in journalism of the plaintiff testify with frank sincerity that he is a fair man, and would not publish evil of another unless he thought he was justified; and that he is prone to adhere to what he has written, and will not correct until thoroughly satisfied he has been wrong, while others attribute to him a propensity for vilification, and obstinacy in repeating it. From the testimony of the first class of witnesses it would appear that personally and in his character of man he is kind-hearted, honorable and just, while that of the other class attributes to him the opposite qualities as a journalist. A dual character is thus unfolded. We regret that we have here to deal with the least attractive side of it.

The publications made by the plaintiff concerning the defendant were offensive, and they were untrue. The information needful for the correction of them was furnished him by the defendant, and he did not give to the public the refutation thus supplied him. On the contrary he aggravated the wrong already done by opprobriously characterizing Mr. Van Benthuysen by name. Then followed the card—a Roland for an Oliver.

" If a man is in the habit of libelling others, he complains with a very bad grace of being libelled himself, and if two men are concerned in publishing monstrous libels against each other every day, there can be no claim for damages on either side." Finnerty vs. Tipper, 2 Camp. 72. That is the language of a great judge a hundred years ago, and is as true now as then, and has been echoed judicially whenever occasion arose. "Where two parties engage in a newspaper controversy and hurl abusive epithets at each other, they are both in the wrong and neither of them should receive damages from the other." Child vs. Homer, 13 Pick. 510. And this is as true where one of the parties is an editor of a newspaper as where both are private persons. Newspaper editors, and writers on a newspaper staff, have no peculiar rights or privileges in this respect, and have no more claims to indulgence than others. King vs. Root, 4 Wend. 138 and other authorities cited in Cooley's Const. Lim. 565 note. They are held to the same responsibility with any other person, and malice on their part is conclusively inferred if the publication is false. It is no defense that it has been copied from another newspaper without comment, or that the source of the information is stated at the time of the publication, or that it was made without the knowledge of the editor or proprietor, or as an advertisement or card. Cooley's Const. Lim. 567.

The law protecting the community, and the individuals who compose it, from indiscriminate and libellous assaults of a newspaper was never more vigorously or correctly stated than by one of the most eminent courts of our country. The contention in Hotchkiss vs. Oliphant, 2 Hill, 513 was that the editor of a newspaper is at liberty to copy an item of news from another paper, giving at the same time his authority, without subjecting himself to legal responsibility, unless express malice be shown. It was conceded that the law did not, and ought not to, extend a similar indulgence to any other class of citizens, but that a distinction should be made in favor of editors on the ground of their peculiar occupation—that their business was to disseminate useful information, to publish such matters relating to the current events of the day as fell within the sphere of their observation, and as the public curiosity or taste demanded; and that it was impracticable for them at all times to ascertain the truth or falsehood of the various statements contained in other journals.

This was reducing the defense to much narrower limits than in the present case, and it was there suggested that if the law were not thus indulgent, some legislative relief might become necessary.

"Undoubtedly," said the Court, "if it be desirable to pamper a depraved public appetite or taste by the republication of all the falsehoods and calumnies upon private character that may find their way into the press—to give encouragement to the widest possible circulation of these vile and defamatory publications by protecting the retailers of them—some legislative interference will be necessary, for no countenance can be found in the law for the irresponsibility claimed. The law reprobates the libeller, and subjects him to both civil and criminal responsibility. His offense is ranked by it with that of the receiver of stolen goods, the perjurer, and suborner of perjury, the disturber of the public peace, the conspirator, and other offenders of like character. * * * If an editor or publisher chooses to become the retailer of private scandal, without taking the trouble to inquire into the truth of what he publishes, the law, which is as studious to protect the character as the property of a man, will hold him to responsibility. The rule is not only just and wise in itself, but if steadily and inflexibly adhered to and applied by courts and juries, will greatly tend to the promotion of truth, good morals, and common decency on the part of the press, by inculcating caution and inquiry into the truth of charges against private character before they are published and circulated throughout the community." Quoted approvingly in Cooley's Const. Lim. 564-5.

It is not pretended that the plaintiff did not begin this newspaper warfare. On the contrary it is admitted and announced with a sort of truculent frankness, and both he and his assistant seem to regard their assaults on Mr. Van Benthuysen as an innocent pastime, quite justifiable and even praiseworthy.

The letter of the defendant, protesting against these assaults, and setting forth the proof of falsity of the publications, contained language as objectionable as the newspaper paragraphs, but it did not meet the public eye, and was not intended for the public. It was a private letter of indignant remonstrance, and a furious personal invective, but it furnished the proof that he had been wronged. The plaintiff's first and imperative duty was to repair the wrong—a duty thrice due—to himself, to the party assailed, to the public. The same learned Court just quoted says, when the publisher is "advised of his error and hesitates to correct it, the case rises to one of premeditated wrong, of settled and determined malignity towards the party injured, which should be dealt with accordingly. All the charities of the law give way at such a prostitution of the public press." Hotchkiss case *est supra*, 516.

This Court has uniformly maintained the rule that one, who is himself in fault, cannot recover damages from another who has retaliated in kind, although the latter was not justifiable in law, and this in spite of the truism that one wrong does not justify another. Barrow vs. Landry, 15 A. 682; Vernon vs. Bankston, 28 A. 710; Johns vs. Brinker, 30 A. 241; Young vs. Bridges, 34 A. 333; Ludeling vs. Stubbs, *Ibid*, 940. And it is so universally applied that the text-writers have formulated it in the declaration that "a man who himself commenced a newspaper war. cannot subsequently come into court as a plaintiff to complain that he has the worst of the fray." Odgers on Slander and Libel, 228.

The lower judge refused to grant a new trial because there had already been two, the first resulting in a verdict for a larger sum, and though he disapproved the verdict upon the second trial. To use his own language, "the sooner the case reached the Supreme Court, the better for the cause of the administration of practical justice which," he said, "had been obstructed for two entire jury terms by this pest of a suit." Therefore,

It is ordered and decreed that the verdict of the jury is set aside, the judgment of the lower court thereon is annulled, and that the defendant W. Van Benthuysen have judgment against the plaintiff rejecting his demand, and for costs.

### CONCURRING OPINION.

FENNER, J. While the paragraphs in the City Item, prior to the card of January 21, 1882, referring to the Crescent City Railroad Company and the defendant as its president, were not conceived in a spirit of ultra politeness, they pertained to matters of public interest entirely within the province of journalistic comment and are, in no sense, libelous or abusive. When corporations enter into contracts with a city touching subjects of such public character as the use of its streets, such contracts, their terms and obligations, and their proper execution, are fit subjects of legitimate criticism by the press; nor do I think that the president of such a corporation, who is generally the actor in the procurement and execution of such contracts, can claim immunity from the use of his name in articles upon such subjects.

While courts should not hesitate to rebuke and repress licentiousness of the press, they should be careful not to emasculate its liberty in the exercise of its appropriate functions.

In absence of any proof of malice or intentional falsification, I think the articles, now referred to, furnished defendant no ground of legal complaint.

I see no reason to doubt that, had the conclusive evidence of the mistakes under which the paper labored, furnished by the defendant in his letter of January 20, 1882, been unaccompanied by the abusive and insulting language contained therein, it would have led to prompt correction and amend.

This language, however, while it provoked, did not, in law, justify the article published in the Item of January 21, 1882, in which defendant was denounced as an "irate swaggerer," a "bulldozer," an "arrogant blusterer," ignorant of "how to couch his ideas in polite and gentlemanly language," etc.

The letter of defendant had not been published. The last-mentioned article of the Item was the inauguration of the *newspaper* warfare, which culminated in the card of defendant, which is the basis of this suit for libel.

This destroys the foundation of plaintiff's case, and brings him within those authorities which hold that "a man who, himself, commenced a newspaper war, cannot subsequently come to the Court, as a plaintiff, to complain that he has had the worst of the fray." Odgers on Slander and Libel, 228, 219.

"Where two parties engage in a newspaper controversy and hurl abusive epithets at each other they are both in the wrong, and neither of them should recover damages from the other." Child vs. Homer, 13 Pick., 510. Finnerty vs. Tipper, 2 Camp, 72.

For these reasons, I concur in the decree herein.