No.——

First Circuit

———

SLOANE v. FRANCHEBOIS

———

(May 8, 1928.  Opinion and Decree.)

———

*(Syllabus by the Editor.)*

1. **Louisiana Digest—Evidence—Par. 69, 72.**

Previous difficulties aid in understanding the motives, conduct, apprehensions, impulses and acts of the parties which resulted in and precipitated the shooting.  Therefore, previous difficulties between the parties and communicated threats can be proved and taken into account.

2. **Louisiana Digest—Homicide—Par. 30, 34.**

Whenever a man undertakes self-defense, he is justified in acting on the facts as they appear to him.  If without fault or carelessness he is misled concerning them and defends correctly according to what he thus supposes the facts to be, the law will not punish him, though they are in truth otherwise, and he has really no occasion for the extreme measure.

3. **Louisiana Digest—Homicide—Par. 27, 32; Death by Wrongful Act—Par. 3.**

Where the parties in a shooting affray had previous difficulties and knew each other to be enemies, it was the fault of one of the parties although unarmed but immediately followed by a son with drawn pistol to approach an enemy, thus provoking the difficulty which caused his death.

Appeal from the Parish of St. Landry. Hon. B. H. Pavy, Judge.

Action by Mrs. Julia Sloane against Mrs. Bernadette Franchebois, individually, and as natural tutrix.

There was judgment for defendant and plaintiff appealed.

Judgment affirmed.

L. Austin Fontenot and H. G. Brunson, of Opelousas, attorneys for plaintiff, appellant.

Dubuisson, Perault and Burleigh, of Opelousas, attorneys for defendant, appellee.

ELLIOTT, J.  As John Childs walked up toward Joseph Cormier who was standing at the end of the table on which the voting in the primary election of April 9, 1924, at Plaquemine Point in the Parish of St. Landry was in progress, said Cormier drew his pistol and killed him.

Mrs. Julia Sloane, widow of John Childs, in her capacity of widow, claims of Bernadette Franchebois, widow of Joseph Cormier, individually, and as natural tutrix of his children, $12,150.00 in damages on account of the death of said Childs at the hands of said Cormier.

She alleges in her petition that said killing was without just cause or provocation and that her husband in no way contributed to the affray which led thereto.

Defendant admits that plaintiff's husband lost his life at the hands of her husband, but she alleges that John Childs and Thomas Childs set upon her husband without cause, reason or provocation, a short time before the difficulty in which their husbands were both killed, and inflicted upon him a number of knife wounds of a serious nature.  That John Childs was the aggressor and if not the aggressor that he was at fault, both in the difficulty in which respondent's husband was stabbed, and in

the one which plaintiff's and respondent's husbands were both killed, and that the plaintiff is barred from recovering damages for any wrong resulting from her husband's own fault. The demand of the plaintiff was rejected in the lower court, and the plaintiff has appealed.

The evidence shows that when John Childs was killed, the shooting continued between Joseph Cormier and Joseph Castille on one side and Thomas Childs and Getty Childs on the other, until Getty Childs was shot down and badly wounded. Thomas Childs and Joseph Cormier were both killed. Jean B. Richard, a bystander, was wounded by a ball which struck him and felled him to the ground. Arville Richard, another bystander, and Joseph Castille were wounded.

The defendant was allowed to prove on the trial, a cutting affray at Bourque's Store, which had taken place between Joseph Cormier and John and Thomas Childs on August 23, 1924, in which Joseph Cormier received four or five wounds at the hands of John and Thomas Childs. Both the Childs were cut by said Cormier but their wounds were not serious. Joseph Cormier was badly cut. The surgeon who treated him testified that two of his wounds were three inches in length, while another deep and dangerous wound in the back required fifteen sutures.

The defendant was also permitted on the trial to prove a previous difficulty between Thomas Childs and Joseph Castille which had occurred in the neighborhood about a year before. Castille was a tenant on the place of Cormier at the time. In this difficulty, Thomas Childs, according to Castille, threatened his life. He also testified that Thomas Childs at the same time made threats against Cormier which he communicated to Cormier.

The plaintiff objected to the above on the ground that these previous difficulties were not connected with the suit on trial and had no bearing on the issue involved, and contends that the evidence should not have been received nor considered.

The evidence shows that Thomas Childs commenced the difficulty at Bourque's Store by approaching Cormier and kicking him without previous warning. Cormier asked him what was the matter, upon which Thomas Childs answering, replied: "Remember when you hit me when I was a child. Now I am a man like you." The evidence does not show which was the first to open and draw his knife, but they both drew knives and commenced cutting each other. John Childs was present when the cutting commenced and immediately drew his knife and joined Thomas Childs in cutting Cormier, cutting him, a witness says, in the side and back.

Joseph Cormier was one of the commissioners at the election at Plaquemine Point. He left home to attend the election accompanied by Lucien and Joseph Castille. Lucien, father of Joseph Castille, was not armed, but Joseph Cormier and Joseph Castille both went to the election armed.

John Childs had also been appointed as one of the commissioners but did not attend in time to serve. He left home to come to the poll about half past ten o'clock and arrived there about eleven o'clock a. m. He was not armed and was in his shirt sleeves, but he was accompanied by Thomas Childs and Getty Childs who were also in their shirt sleeves, but both of whom were armed. Their pistols were carried in scabbards which were held in place around their waists by a belt and strap over the shoulder, but under their shirts.

These previous difficulties showed the mental attitude of John Childs and Joseph Cormier toward each other when they left home on the morning of the election, at which they each had good reason to expect they would be close to each other. They also tend to indicate the reason why Joseph Cormier went to the election armed, and why John Childs, although himself unarmed, was accompanied by Thomas Childs and Getty Childs, both of whom were armed. Likewise they tend to indicate the likelihood that Cormier was apprehensive of being again attacked by John and Thomas Childs. The parties lived in the same neighborhood and two witnesses testified that they expected a difficulty between them such as occurred, when they would meet.

These previous difficulties aid in understanding the motives, conduct, apprehensions, impulses and acts of the parties which resulted in and precipitated the shooting. In such a situation and for purposes of the kind, previous difficulties between the parties and communicated threats can be proved and taken into account.

Greenleaf, Vol. I, chap. V, section 101, etc. Whigmore, Vol. 1, Chap. 11, Subject: Evidence to prove human quality or condition. Sections 246, 247, 248, pages 306 to 317. The evidence was properly received and taken into account.

The election was being held in a small house which had been built for a garage and had no floor. It stood near a road and was entered by a double doorway which fronted the road. The table on which the voting was being done was two or three feet inside the building and in front of the doorway. When a party came to vote, he had to come up in front of the doorway, and in order to prevent crowding in such small quarters, the officers holding the election had roped off a space ten or twelve feet just outside the doorway, leaving in it an opening in front of the doorway through which the voters could come to the table and get their ballots. When John, Thomas and Getty Childs arrived, instead of entering the passageway and proceeding to the table through the opening left for that purpose, they each stepped over the rope as they came to it, John Childs leading the way, speaking pleasantly to an acquaintance as he did so. Getty tarried a moment near the inside of the rope, but John Childs, followed by Thomas Childs, walked straight towards Joseph Cormier who was standing inside the garage at one end of the table. He said nothing to Cormier and the evidence indicates that he had nothing in his hand, but the position of his hands at the time, does not appear. When he got up close to Cormier, the exact distance not being shown, but evidently within about three feet, Joseph Cormier, without saying anything, suddenly drew his pistol and shot him. Some of the witnesses outside the building estimate that Thomas Childs was ten or twelve feet behind, as his father stepped over the rope and walked toward the table. Other witnesses outside state that he was only four or five feet behind him, and they are supported by a witness who was inside the building, and who was looking at Thomas Childs at the time his father was shot. This witness says that he was only four or five feet from Cormier at the time, and that John Childs was in between them, consequently Thomas Childs must have been as close as two or three feet behind his father at the time he entered the doorway and advanced toward Cormier.

Stepping over the barrier instead of going through the opening left in it, tends to indicate a previous resolve on some-

thing other than the mere right of suffrage.

As Thomas Childs stepped over the rope barrier, he was seen to place his hands in his bosom. His pistol was concealed in his bosom and it was necessary for him to put his hand in there in order, to get it. It therefore seems that he either got hold of or made ready to get his pistol immediately after getting over the rope barrier, because it was in his hand and pointing toward Cormier when he got within four or five feet of him.

Mr. Thibodeaux is clearest as to the facts in connection with the shooting. He was one of the commissioners of the election. He says that he was inside the building standing at the side of the table within a few feet of Joseph Cormier and John and Thomas Childs and looking right at them. His statements carry the conviction of sincerity and truth. We accept his testimony that Joseph Cormier was inside the building in which the election was being held and standing at the head of the table, and that John Childs came through the double doorway, walked straight toward Cormier, facing him, and that when he got within three or four feet of Cormier, Cormier suddenly drew his pistol and shot him. That John Childs dropped to the ground the moment he was shot. That the fall of John Childs disclosed Thomas Childs to his view, standing with a pistol already pointed at Cormier, only four or five feet distant from him. That Thomas Childs shot Cormier, the report of his pistol following so close after the report of Cormier's pistol that the two shots seemed almost like one. The testimony of this witness that Thomas Childs was standing either in or just outside the doorway at the time his father was shot is corroborated by the fact that the bodies of John and Thomas Childs after they were killed, were both lying near the doorway almost side by side.

The other commissioners also saw the commencement of the shooting from the inside of the building. They saw Joseph Cormier shoot John Childs, but did not see Thomas Childs. They say that Joseph Cormier immediately went outside after shooting John Childs, and as he did they heard further shooting. One of them says that the shooting inside and that outside were practically all at the same time, and all agree that the bodies of John Childs and of Thomas Childs were both lying, immediately after the shooting, near the doorway, and almost side by side.

The other commissioners did not see all that the witness Thibodeaux saw, probably because of their angle of vision at the time, or for some other reason. None of them denied the facts testified to by Mr. Thibodeaux; they simply said they didn't see it, etc.

The witness, Thibodeaux, says that after Thomas Childs shot Cormier, and Cormier shot him, that they changed their positions; that the shooting continued, but he did not see the balance of it.

Witnesses outside of the building say that Cormier came outside shooting; that Getty Childs was shooting at him from a distance of eight or ten feet from the doorway.

Plaintiff contends that John Childs in his shirt sleeves, walked peaceably and unarmed toward the ballot box for the purpose of voting. That he said nothing to Cormier; was not making any hostile demonstration, and that Cormier had no right to shoot him. But we are satisfied from the evidence that at the time Joseph Cormier shot John Childs, he could and did no doubt, see Thomas Childs also advancing behind John Childs prepared to shoot,

and believed that John Childs and Thomas Childs designed to attack him, and that his life was in immediate danger at their hands.

The facts and circumstances justify the presumption that John Childs knew that his sons were armed against Cormier. We feel that it would be unreasonable to doubt knowledge on his part that Thomas Childs was following right behind him with a pistol in his hand prepared to shoot Joseph Cormier where he stood. Cormier knew that they were his enemies and he saw them coming toward him at close quarters in a place from which there was no way to get out except by going over them; one of them was armed with a pistol and prepared to shoot; the foremost for all he knew, for the purpose of shielding or aiding the one behind in the attack. In such a situation Mr. Cormier, likely not fully recovered from his wounds received at their hands seventeen days before, could not be expected to wait and see what they were going to do. Under such a showing if Cormier had been prosecuted for having killed Mr. Childs, he could have reasonably urged that he had done no more than his safety appeared to require.

In Bishops New Criminal Law, General and Elementary, that author says, Chapter XIX, Section 303, pp. 173 and 174:

"What is absolute truth no man ordinarily knows. All act from what appears, not from what is. If persons were to delay their steps until made sure beyond every possibility of mistake that they were right, earthly affairs would cease to move, and stagnation, death and universal decay would follow. All, therefore, must, and constantly do perform what else they would not, through mistakes of facts. If their minds are pure; if they carefully inquire after the truth, but are misled, no just law will punish them however criminal their acts would have been, if prompted by an evil motive and executed with the real facts in view.

"A wrongful intent being the essence of every crime, it necessarily follows, that whenever one without fault or carelessness, is misled concerning facts, and thereon acts as he would be justified in doing were they what he believes them to be, he is legally innocent the same as he is innocent morally.

"The rule in morals is stated in Wayland to be that if a man knows not the relations in which he stands to others, and has not the means of knowing them, he is guiltless. If he knows them or has the means of knowing them and has not improved these means, he is guilty. The legal rule is neatly enunciated by Baron Parke thus: The guilt of the accused must depend on the circumstances as they appear to him. This doctrine prevails likewise in the Scotch law as it necessarily must in every system of Christian and cultivated law."

Again, Section 305:

"If in language not uncommon in the cases, one has reasonable cause to believe the existence of facts which will justify a killing, or in terms more nicely in accord with the principles in which the rule is founded, if without fault or carelessness he does not believe them, he is legally guiltless of the homicide, though he mistook the facts. And so the life of an innocent person is unfortunately extinguished. In other words and with reference to the right of self-defense, and the not quite harmonious authorities, it is the doctrine of reason, and sufficiently sustained in adjudication, that notwithstanding some decisions apparently adverse, whenever a man undertakes self-defense, he is justified in acting on the facts as they appear to him. If without fault or carelessness he is misled concerning them and defends correctly according to what he thus supposes the facts to be, the law will not punish him, though they are in truth otherwise, and he has really no occasion for the extreme measure." See also Section 844, 865 and 874, and Vol. 2, Sec. 645. Blackstone, Vol. 4, Subject: Homicide, Chapter 14, Section 183, page 135. Ruling case Law, Vol. 13, Subject: Homicide, Sections 124, 125, pages 819, 820 and 821. State vs. Swift, 14 La. Ann. 827; State vs. Chandler, 5 La. Ann. 489; Succ. of Roth, 31 La. Ann. 320.

John Childs must be presumed to have been aware that the same motives that had prompted his sons to come to the election armed, had also likely caused Cormier to do likewise, and that to approach him as he did, with Thomas Childs following close behind with a pistol in his hand, was calculated to create an irresistible apprehension in Cormier's mind that his life was in great and immediate danger at their hands. He advanced ahead of Thomas Childs, and it seems to us under all the facts and circumstances of the case that it cannot be supposed that Thomas Childs would have had a pistol if his father merely designed to vote and return as he had come, but that it was to attack Cormier again. The conduct of John Childs must therefore be regarded as wrongful in the extreme, and to have precipitated the act of Cormier which cost John Childs his life. Under the evidence John Childs was at fault in bringing on the difficulty and therefore his widow cannot justify a recovery under the law, Civil Code, Art. 2315, based on said act of Cormier, when her husband was himself at fault in causing the act, even though defendant's husband was not justified under the law in what he did. Vernon vs. Bankston, 28 La. Ann. 710; Bigney vs. Benthuysen and "The States," 36 La. Ann. 38; State ex rel. Levet vs. Lapeyrollerie, et al., 38 La. Ann. 267; Childs vs. Lockett, 107 La. 272, 31 So. 751; Massett vs. Keff, 116 La. 1108, 41 So. 330; Bonneval vs. American Coffee Co., et al., 127 La. 58, 52 So. 426; Hingle vs. Myers, 135 La. 383, 65 So. 549; Fontenelle vs. Waguespack, 150 La. 317, 90 So. 662; Lide vs. Parker, C. C. A., Vol. 6, pages 648 and 649.

We agree with the District Judge in his conclusions on the law and the facts.